UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE BRIKHO,

    Plaintiff,

v.

CITY OF INKSTER, *et al.*,
    Defendants.

Case No. 18-12965
Honorable Laurie J. Michelson
Magistrate Judge Stephanie Dawkins Davis

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Suite B, Inc. operated a medical-marijuana facility in Inkster, Michigan. Initially, the corporation had only one owner. But a few years into the operation, Suite B added new shareholders, including George Brikho. Soon after Brikho came on board, the City of Inkster denied Suite B a license to continue operating. Now Brikho sues Inkster, raising a host of state and federal claims. Inkster moves for judgment on the pleadings, arguing, essentially, that Brikho lacks standing to sue over Suite B, Inc.'s injuries. For the reasons that follow, the motion is granted.

**I.**

In 2016, Suite B obtained a license to operate a medical-marijuana dispensary in Inkster, Michigan. (ECF No. 1, PageID.6.)[1] Soon after, Suite B opened its doors. (*Id.*) At the time, Suite B was wholly owned by Patrick Wimberly, a former member of Inkster's city council. (*Id.*) To help with the licensing process, Wimberly and Suite B retained the services of Byron Nolen, then an attorney, but soon to be Inkster's mayor. (*Id.*)

---

[1] The complaint refers to Suite B, Inc. while Plaintiff's response brief refers to Suite B, LLC. But because the complaint alleges Suite B is a corporation with shareholders, at this stage the Court understands Suite B, Inc. to be the proper designation.

Suite B's license to operate was renewed in 2017. (ECF No. 1, PageId.6.)

Then in early 2018, Suite B, Inc. added three new shareholders: Farida Holdings, LLC, George Brikho, and Frank Cimeot. (*Id.* at PageID.7.) Of the three, Brikho invested a substantial sum into Suite B and its real property (i.e., the dispensary). (*Id.*)

In April 2018, Suite B applied for the yearly renewal of its license. (ECF No. 1, PageID.7.) But a month later, Inkster denied Suite B's renewal application. (*Id.*) In denying the application, Inkster officials noted that Wimberly had at least one prior conviction (dating from the 1990s). (*Id.* at PageID.7.) Shortly after, Suite B closed its doors and laid off 20 employees. (*Id.*)

In the interim, Suite B appealed. Suite B directed its appeal to its former lawyer, Byron Nolen, by this time Inkster's mayor. (ECF No. 1, PageID.8.) And just days after Inkster denied Suite B's application, Mayor Nolen conducted an appeal hearing. (*Id.*) Mayor Nolen presided, and in attendance were Charles Nolen, a relative of and special advisor to Mayor Nolen (*id.* at PageID.4), Felicia Rutledge (Inkster's city clerk), and all of Suite B's shareholders. (*Id.*)

According to the complaint, three notable things happened at the hearing. For one, Charles Nolen falsely alleged that Brikho had a criminal history. (ECF No. 1, PageID.8.) And Charles Nolen alleged that one of Suite B's partners had previously sued Inkster. (*Id.*) Finally, Mayor Nolen told Suite B's shareholders that Inkster had an unofficial policy of excluding non-residents from owning medical-marijuana dispensaries. (*Id.*)

Brikho alleges Mayor Nolen's comment about non-residents was significant. At the time, Brikho, a Chaldean Arab, lived in Oakland County. (ECF No. 1, PageID.4.) But Inkster is in Wayne County. (*Id.*) Brikho further alleges that around the time of Suite B's renewal application and appeal, Mayor Nolen was making it known he did not want Arabs in his city and did not want Arabs profiting off sales of marijuana to Inkster residents. (*Id.* at PageID.8–9.)

Mayor Nolen took the appeal under advisement. (ECF No. 1, PageID.8.)

Around the same time, Charles Nolen reached out to Wimberly and Cimeot. (ECF No. 1, PageID.9.) Charles Nolen said Suite B could reopen if Brikho's shares were transferred to an African-American woman connected to Mayor Nolen. (*Id.*) And Charles Nolen made clear that unless and until Brikho was removed as a shareholder, Suite B would not reopen. (*Id.*) Even more, Mayor Nolen told Wimberly that Brikho was a member of the Chaldean mafia, a group not welcome in Inkster. (*Id.* at PageID.9.)

Brikho would not sell his shares. (ECF No. 1, PageID.9.) So, says Brikho, Mayor Nolen denied Suite B's appeal, and about a week later Suite B appealed to Inkster's city council. (*Id.*) In July 2018, the City Council, with Mayor Nolen presiding, heard the appeal and denied it. (*Id.* at PageID.10.)

Suite B's dispensary closed down shortly after.

Brikho alleges two distinct motivations drove Mayor Nolen to refuse to renew Suite B's license. The first was prejudice. Brikho alleges Mayor Nolen dislikes Arabs, especially Chaldean Arabs. (ECF No. 1, PageID.9.) And the second motivation was financial. Charles Nolen communicated that Suite B could stay open so long as an individual connected to Mayor Nolen was given a slice of Suite B. (*Id.* at PageID.8.) And Suite B's closure left only two medical marijuana dispensaries in Inkster, each with a financial connection to Mayor Nolen. (*Id.* at PageID.10.) So for those reasons, Brikho alleges that Mayor Nolen conspired behind the scenes to deny Suite B's 2018 renewal application and deny its appeal. (ECF No. 1, PageID.7–8.)

As a result of all of the above, Brikho, not Suite B, sued Inkster, Mayor Nolen, Charles Nolen, Inkster's clerk, and every member of Inkster's city council.

Brikho brings numerous state and federal claims. The federal counts include civil rights claims against all Defendants. One count alleges denials of procedural and substantive due process and another alleges an equal protection violation. (ECF No. 1, PageID.12–13.) A third count, brought against every member of the city council, alleges failure to intervene. (*Id.* at PageID.14–15.) And the fourth count alleges a conspiracy to violate civil rights pursuant to "§ 1983/1985." (*Id.* at PageID.15–16.) Brikho also adds a *Monell* claim against Inkster and a civil RICO claim against the Nolens. (*Id.* at PageID.17–19.) Then there are the state claims, including an ELCRA count, intentional infliction of emotional distress, civil conspiracy, abuse of process, one count styled as "Negligence/Gross Negligence/Recklessness," and a count styled "Breach of Duties." (*Id.* at PageID.20–22.)

All Defendants have moved for judgment on the pleadings. (ECF No. 8.) Brikho responded by seeking leave to amend and leave was granted. (ECF Nos. 11, 14.) But Brikho withdrew that request and never filed an amended complaint. So all Defendants renewed their motion for judgment on the pleadings. (ECF No. 20.)

## II.

A Rule 12(c) motion for judgment on the pleadings is on all fours with a Rule 12(b)(6) motion to dismiss. *See Estate of Manolios v. Macomb Cty.*, No. 18-1799, 2019 U.S. App. LEXIS 25069, at *5 (6th Cir. Aug. 22, 2019); *Greer v. City of Highland Park*, 884 F.3d 310, 314 (6th Cir. 2018). So all well-pleaded factual allegations are accepted as true, and Brikho gets the added benefit of all plausible inferences drawn in his favor. *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005). To withstand a 12(c) motion, Brikho's complaint must contain enough facts to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Facially plausible means the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" but is not akin to a probability requirement. *Id.* And "[t]he plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

### III.

In seeking dismissal on the pleadings, Defendants make essentially one argument: George Brikho is not the right plaintiff. They say Brikho's injuries all derive from Suite B, Inc.'s injuries. So Suite B is the right plaintiff. And Defendants rely on three doctrines: Brikho lacks Article III standing (ECF No. 20, PageID.250–254), Brikho is not the real party in interest pursuant to Rule 17 (*id.*), and Brikho has failed to join Suite B, an indispensable party, and so the complaint should be dismissed pursuant to Rule 12(b)(7) (*id.* at PageID.254–258).

In response, Brikho says the complaint speaks for itself. (ECF No. 22, PageID.278.) Based on the allegations in the complaint, Brikho says he has standing to sue. (*Id.* at PageID.291–297.) And he is the real party in interest. (*Id.* at PageID.297–298.) And there is no need to join Suite B. (*Id.* at PageID.299–300.)

### A.

Alternatively, Brikho provides evidence outside the pleadings, and invites the Court to convert the Rule 12(c) motion into a Rule 56 motion for summary judgment. (ECF No. 22, PageID.292, 285–290.) However, the Court is not inclined to skip ahead to summary judgment. This case is still at the pleading stage, no discovery has been conducted, and parties in this district

5

are only allowed one summary judgment motion without leave. *See* E.D. Mich. L.R. 7.1(b)(2). So to ensure that Defendants' 12(c) motion is not converted to a motion for summary judgment, the Court makes clear that it is excluding all outside evidence presented in Brikho's response briefing and relying solely on the well-pleaded factual allegations in Brikho's complaint. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503–04 (6th Cir. 2006).

The Court thus turns to the complaint to evaluate Defendants' arguments.

**B.**

As Defendants think Brikho lacks Article III standing, and standing is a jurisdictional requirement, the Court starts there.

To establish Article III standing to bring a claim, Brikho must show three things: that he sustained an injury in fact—i.e., an invasion of a "legally protected interest" that is both "concrete and particularized" and "actual or imminent," that he can trace the injury to the Inkster Defendants' conduct, and that a decision in his favor would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61(1992).

Defendants point out that Brikho alleges the following: (1) he was a shareholder of Suite B; (2) Suite B had its license revoked; and (3) Suite B went out of business. So Brikho, as a shareholder of the corporation, alleges he was injured to the tune of lost business income and opportunity. But all those injuries, say Defendants, are derivative of Suite B's injuries. Thus, Defendants insist Brikho lacks a personal injury sufficient to satisfy Article III. (ECF No. 20, PageID.251.) And as Brikho is the only plaintiff, if he lacks standing then this court lacks subject-matter jurisdiction.

Boiled down, Defendants' argument relies on the shareholder-standing doctrine. And the Court has recently explored whether shareholder standing is a concern of Article III or Federal

Rule of Civil Procedure 17. *See Williams v. City of Detroit*, No. 16-14112, 2019 U.S. Dist. LEXIS 95895, at *9–16 (E.D. Mich. June 7, 2019). Here, Defendants conflate the two. (*See* ECF No. 20, PageID.250–254.) But precision is important: Article III is jurisdictional, while real-party-in-interest is an affirmative defense. *See Cranpark, Inc. v. Rogers Group, Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (explaining why shareholder standing implicates Rule 17's real-party-in-interest analysis rather than Article III standing).

In any event, some Sixth Circuit caselaw does hold that a shareholder of a corporation cannot satisfy Article III's personal injury requirement when bringing suit "based solely on an injury to a corporation." *Old Blast, Inc. v. Operating Eng'rs Local 324 Pension Fund*, 663 F. App'x 454, 457 (6th Cir. 2016). Only where a shareholder alleges injuries separate and distinct from the corporation does a shareholder have Article III standing. *Id.* However, other Sixth Circuit caselaw treats shareholder standing as a question of statutory interpretation better fit within the real-party-in-interest analysis. *See Cranpark*, 821 F.3d at 730.

Regardless, it is clear that standing for the purposes of Civil RICO is non-jurisdictional. *See Stooksbury v. Ross*, 528 F. App'x 547, 555–56 (6th Cir. 2013); *see also Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612–13 (6th Cir. 2004) (referring to an individual's standing under RICO as "statutory standing"). And it is equally clear Brikho has no standing under RICO. That act does not allow a corporation's shareholder or employee to bring a federal claim based on an injury to the corporation. *See Warren v. Manufacturers Nat'l Bank*, 759 F.2d 542, 545 (6th Cir. 1985). Brikho broadly alleges that he was "injured in his business and property" as a result of the Defendants' illegal activities "in wrongfully revoking the license of Suite B" so they could steer Suite B's costumers to the other two dispensaries in Inkster in which they had financial interests.

7

(ECF No. 1, PageID.19.) So Brikho's civil RICO claim, based on damages resulting from Suite B's loss of its license, is subject to dismissal for lack of shareholder (or statutory) standing.

Among the federal counts, that leaves only Brikho's § 1983 claims. To the extent shareholder standing is a question of statutory interpretation, § 1983 also does not permit a shareholder of a corporation to maintain a claim based on injuries suffered by the corporation. *See Smith v. Martin*, 542 F.2d 688, 690 (6th Cir. 1976) ("The district court was correct in its holding that a stockholder cannot maintain an action under [§ 1983] for damages suffered by a corporation in which he owns shares."); *see also Quarles v. City of E. Cleveland*, No. 99-3050, 1999 U.S. App. LEXIS 34061, at *7–8 (6th Cir. Dec. 20, 1999) (citing *Smith* for same). And to the extent shareholder standing is an Article III concern, Brikho only has standing if he alleged an injury separate and distinct from Suite B. *See Old Blast*, 663 F. App'x at 457. So the remaining issue is whether any of Brikho's § 1983 claims allege injuries separate and distinct from Suite B's injuries.

*Fourteenth Amendment Claims.* Brikho's equal protection and due process claims home in on Inkster's denial of Suite B's renewal application. Brikho's complaint makes clear he never participated in the licensing process in his individual capacity. And he further alleges that he never lost his shares in Suite B or was precluded from being a shareholder. Instead, Brikho emphasizes Nolen's animus toward Arabs (ECF No. 1, PageID.11), Inkster's "arbitrary and conscious-shocking conduct" (*id.* at PageID.12), and a failure on the part of the city to apply the law equally (*id.* at PageID.13). And Brikho frames his damages as "financial loss in the form of lost earnings and value of his stock." (ECF No. 22, PageID.12.) This is precisely the type of derivative harm that does not confer standing on a shareholder. *Old Blast*, 663 F. App'x at 457 ("But depreciation in the value of a shareholder's stock in a corporation does not establish the type of direct, personal injury which is necessary to sustain a direct cause of action." (internal quotations omitted)). And

8

even though Brikho alleges Inkster considered Brikho's religion and national origin when denying Suite B's renewal application, it was still Suite B that was directly injured and Brikho only indirectly so. *See Riggins v. Polk Cnty.*, 602 F. App'x 765, 768 (11th Cir. 2015) (holding that a sole shareholder lacked Article III standing to pursue race- and gender-based equal protection challenges against a municipal bidding process when only the corporation participated in the bidding process); *Gersman v. Group Health Ass'n*, 725 F. Supp. 573, 577–78 (D.D.C. 1989) (holding that a Jewish principal shareholder lacked standing under § 1981 to sue an insurer that discriminated against the shareholder's company).

*Failure to Intervene.* Seemingly because the individual city council members did nothing to stop Mayor Nolen from allegedly violating Brikho's Constitutional rights, Brikho brings "failure to intervene" claims against all of them. (ECF No. 1, PageID.14.) Giving him every benefit of the doubt,[2] Brikho alleges the city council members' failure to intervene caused him "physical harm, severe emotional distress and anguish, and great financial damages." (*Id.*) For the reasons discussed above, the financial damages are derivative. And there are no allegations that make a claim of physical injury plausible. While emotional distress does sound "separate and distinct" from Suite B's injuries, the complaint leaves no doubt it is the byproduct of the denial of Suite B's renewal application. In other words, Brikho's emotional distress from the closure of Suite B, resulting in the loss of income and investment, was derivative of an injury to Suite B. *See Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir. 2001). ("A 'distinct' injury is one in which the claimant's rights have been violated, not merely one in which the claimant is indirectly harmed because of one party's injury to another."). And there is no "emotional distress

---

[2] The Court questions the viability of this type of general "failure-to-intervene" claim, but Defendants do not raise that argument.

and anguish exception" to the shareholder-standing rule. *See id.* ("Doubtless a sole shareholder may suffer shame and humiliation when the corporation is destroyed, but an 'emotional injury' exception would swallow the rule against shareholder standing.") Here, too, Brikho does not allege an injury separate and distinct from Suite B.

*Section 1983/1985 Conspiracy*. Brikho alleges all Defendants conspired to violate his civil rights. And the purpose of the conspiracy was to deprive Brikho of his property. (ECF No. 1, PageID.16.) It is not clear what Brikho means by his "property." To the extent Brikho means his shares in the company, nothing in the complaint indicates Brikho had to part ways with them. And while Brikho does allege he made significant investments into Suite B's real property, Brikho never alleges he, individually, owned the real property. So even giving him every reasonable inference, Brikho's "property" deprivation must be the reduced value of his shares in Suite B.[3] There, too, Brikho has an indirect injury.

*Monell*. Finally, Brikho alleges the City of Inkster abided a "policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and 'unconstitutional behavior by their officers and agents." (ECF No. 1, PageID.17.) But, here, too, Brikho points to the same damages articulated above. (*Id.* at PageID.18.) So nothing in the allegations under the *Monell* count support an injury separate and distinct from Suite B's injuries.

All told, Brikho in his capacity as a shareholder of Suite B lacks shareholder standing to bring any of his federal claims derived from Suite B's loss of its license. Resisting that conclusion,

---

[3] Even if Brikho does personally own real property connected to Suite B such that he has standing, because Brikho alleges all Defendants are members of the same entity, on the merits, Brikho does not have a plausible conspiracy claim. *See Jackson v. City of Cleveland*, 925 F.3d 793, 818 (6th Cir. 2019) (discussing intracorporate conspiracy doctrine).

Brikho makes three unpersuasive arguments as to why he should be allowed to proceed to the merits.

The first relies on cases where shareholder plaintiffs had standing to challenge government policies on First Amendment grounds, (ECF No. 22, PageID.293–296). *See, e.g.*, *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson Co., Tenn.*, 274 F.3d 377 (6th Cir. 2001) (overbreadth challenge to ordinances governing "sexually oriented businesses"); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997) (overbreadth challenge to ordinances governing erotic dancing). However, standing to bring a First Amendment overbreadth challenge is a distinct doctrine. *See Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349–51 (6th Cir. 2007). And even more, in the cases Brikho cites, the shareholders had Article III standing because the ordinances required them, personally, to obtain licenses. *See Deja Vu of Nashville, Inc.*, 274 F.3d at 290 (finding corporate shareholder and director had standing to challenge ordinance that required him to get a license); *DLS, Inc.*, 107 F.3d at 413 (appearing to hold the same). By contrast, Brikho was never personally required to get licensed to operate a dispensary. So *Deja Vu* and *DLS* are distinguishable from Brikho's case.

Next, Brikho turns to *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014). Brikho thinks *Burwell* gives the green light to treating the corporate form as a "legal fiction" and to piercing the corporate veil whenever an action harmful to a corporation is really driven by animus toward the people behind the corporation. (ECF No. 22, PageID.292–293.) But *Burwell* held only that closely-held corporations were "persons" as that term is used in the Religious Freedom Restoration Act. *Burwell*, 573 U.S. at 707–08. So closely-held corporations could bring suit to challenge government regulation that burdened their "exercise of religion." *Id.* at 690–91. Nowhere does *Burwell* upend the shareholder-standing doctrine.

11

Finally, Brikho cites to a Seventh Circuit case explaining the differences between prudential standing and Article III standing, (ECF No. 22, PageID.296–297). *See Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756 (7th Cir. 2008). And as Brikho points out, *Rawoof* holds that a sole shareholder can satisfy the "minimum requirements of constitutional standing by virtue of an asserted [injury to the corporation]." *Id.* But Brikho does not allege he is the sole shareholder. And *Rawoof* ultimately holds that the sole shareholder lacked prudential standing. And the Seventh Circuit's prudential standing analysis parallels the two ways the Sixth Circuit treats shareholder standing. *Compare Rawoof*, 521 F.3d at 757 *with Old Blast*, 663 F. App'x at 457. So *Rawoof* does not advance Brikho's cause either.

As a result, Brikho's federal claims are subject to dismissal for lack of shareholder standing. And where, as here, the federal claims are dismissed before trial, and only state claims remain, federal courts often decline to exercise supplemental jurisdiction over the state-law claims. *See, e.g.*, *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). In deciding whether to exercise jurisdiction, the Court's task is to weigh "judicial economy, convenience, fairness, and comity." *Id*. Here the factors point to declining to exercise jurisdiction. The parties have not conducted any discovery so there are few, if any, worries about judicial economy. And because only state claims remain, comity points to letting the state courts litigate the state-law issues. Finally, as the statute of limitations has been stopped during the pendency of this litigation, *see Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018), Brikho should have no trouble timely re-filing his state claims in state court.

In sum, Brikho alleges he was a shareholder in a corporation that, in part due to personal animus toward Brikho, was denied a license renewal to operate a medical marijuana dispensary in Inkster. As a result of the denial, the dispensary shut down. As a result of the shutdown, Brikho,

as a shareholder, was injured. But this does not give him standing to bring his federal claims. And the Court declines to exercise supplemental jurisdiction over his state claims. So Brikho's complaint is dismissed without prejudice.

SO ORDERED.

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES DISTRICT JUDGE

Date: August 30, 2019

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 30, 2019.

                                              s/William Barkholz
                                              Case Manager to
                                              Honorable Laurie J. Michelson